**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CHERYL L. KULP,**

    **Plaintiff,**

                                **Civil Action 2:20-cv-6188
                                Magistrate Judge Chelsey M. Vascura**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## OPINION AND ORDER

Plaintiff, Cheryl L. Kulp ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for a Period of Disability and Disability Insurance Benefits ("DIB"). The parties have consented to the undersigned' jurisdiction. (ECF No. 6, 7.) Pending before the Court is Plaintiff's Statement of Errors (ECF No. 15), the Commissioner's Memorandum in Opposition (ECF No. 17), Plaintiff's Reply (ECF No. 18), and the administrative record (ECF No. 14). For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's non-disability finding.

## I.      BACKGROUND

Plaintiff protectively filed her DIB application on July 12, 2018, alleging that she became disabled on October 16, 2017. (R. at 163–66.) Plaintiff's application was administratively denied initially on October 19, 2018 (R. at 65–77), and upon reconsideration on February 1, 2019 (R. at 79–91). On March 4, 2020, a hearing was held before an Administrative Law Judge (the "ALJ"). (R. at 37–64.) Plaintiff, represented by counsel, appeared and testified. A vocational expert also appeared and testified at the hearing. The ALJ issued an unfavorable

determination on March 23, 2020.  (R. at 15–36.)  The Appeals Council declined to review that unfavorable determination, and thus, it became final.  (R. at 4–9.)

Plaintiff seeks judicial review of the ALJ's unfavorable determination.  Plaintiff alleges that the ALJ erred when analyzing if her impairments she met or equaled Listings 12.04 and 12.06 at step three of the sequential disability evaluation.[1]  (ECF No. 15 at PageID # 1086–88.)  In addition, Plaintiff alleges that the ALJ erred assessing medical "opinions" from treating psychiatrist, Connie Hirsh, M.D. ("Dr. Hirsh") and clinical social worker, Elaine Rental, LISW.  (*Id*. at PageID # 1082–86.)  The Court finds that Plaintiff's allegations of error lack merit.

## II.    THE ALJ's DECISION

The ALJ issued her decision on March 23, 2020, finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 15–36.)  The ALJ found that Plaintiff

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §§ 404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

meets the insured status requirements of the Social Security Act through December 31, 2023.

(R. at 20.)  At step one of the sequential evaluation process, the ALJ found that Plaintiff has not

engaged in substantial gainful activity since October 16, 2017, the alleged date of onset.  (*Id.*)  At

step two, the ALJ found that Plaintiff has the following severe impairments: Bipolar II Disorder,

Generalized Social Phobia, and obesity.  (*Id.*)  At step three, the ALJ found that Plaintiff does not

have an impairment or combination of impairments that meets or medically equals the severity of

one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1, including

12.04 (Depressive, bipolar and related disorders) and 12.06 (Anxiety and obsessive-compulsive

disorders).  (R. at 21.)

Before proceeding to step four, the ALJ set forth Plaintiff's residual functional capacity

("RFC")[2] determination as follows:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform full range of work at all
> exertional levels but with the following non-exertional limitations: she is limited to
> performing simple, routine tasks; she should avoid performing work with strict
> production quotas and fast-paced work; she could tolerate occasional, but
> superficial interactions, with coworkers and supervisors, with superficial being
> defined as that which is beyond the performance of job duties and job functions for
> specific purpose and a short duration; she should avoid interactions with the public;
> she should avoid tandem work; she should avoid work requiring managerial duties
> and responsibilities; and she is limited to performing work where there are only
> occasional changes and occasional decision-making, to provide for low stress work.

(R. at 23.)  When assessing Plaintiff's RFC, the ALJ found that although her medically

determinable impairments could be expected to cause at least some of her alleged symptoms, her

statements regarding the intensity, persistence, and limiting effects of her symptoms were not

entirely consistent with the record evidence.  (R. at 24.)

---

[2] A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations."  20
C.F.R. § 404.1545(a)(1).

At step four, the ALJ found that Plaintiff is unable to perform her past relevant work as an accounting clerk or risk management supervisor.  (R. at 29.)  At step five, the ALJ relied on testimony from a Vocational Expert ("VE") to determine that in light of Plaintiff's age, education, work experience, and RFC, there are also jobs that existed in significant numbers in the national economy that she could perform such as a cleaner, machine feeder or hand packer. (R. at 30.)  The ALJ therefore concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since October 16, 2017.  (R. at 30–31.)

### III.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that  finding 'even if there is substantial evidence in the record that would have supported an

opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## IV. RELEVANT RECORD EVIDENCE[3]

### A. Plaintiff's Testimony

At the March 4, 2020 hearing, Plaintiff testified to the following about her work history. Plaintiff was a risk management supervisor for UPS for 22 years. (R. at 42.) Plaintiff went on short-term disability for four or five months in October or November 2017, returned to work, and then went on short-term and long-term disability before she was let go in October 2018. (R. at 43–45.) When Plaintiff went on short-term disability in October 2017, she felt like she was drowning. (R. at 45.) She could not keep up with emails and phone calls or keep on top of legal issues she was supposed to be handling. (*Id*.) She also had trouble working and communicating with people. (*Id*.) Plaintiff suffered from bipolar disease, and her long-time psychiatrist, Dr. Hirsh, diagnosed that she was manic and had a lot of anxiety when she went on disability in October 2017, but that currently she was more on the bipolar depressive side. (R. at 45–46.) Since she had stopped working, things had not improved, and she still had trouble focusing, concentrating, and working or interacting with people. (R. at 46.) Although Plaintiff volunteered about two hours a week at a library copying and scanning records, two hours a day

---

[3] Because Plaintiff's claims relate only to her mental health impairments, the Court's discussion is limited to the same.

was the limit for her concentration.  (R. at 46–47.)  Plaintiff could use a computer, however, and had recently looked for more volunteer opportunities.  (R. at 52.)

Plaintiff also testified to the following about her daily life.  Plaintiff kept up at home by hiring cleaning people so that she only had to push herself once a month to clean her kitchen up before they arrived.  (R. at 48.)   Plaintiff had trouble going through mail, so her mother came over once a month to go through it with her.  (R. at 48–49.)  She was able to drive and would drive about three times a week to places like the grocery store.  (R. at 49.)  The farthest she had drive in the past year was an hour and ten-minute trip to her sister's house in Dayton.  (*Id.*)  Plaintiff drove to her mother's house to visit weekly, and her sister would come to visit her maybe once a month.  (R. at 50.)  She also went out to eat with her mother.  (R. at 52.)  She had a cordial relationship with people in her neighborhood where she had lived for 20 years but did not have people with whom she "[did] stuff with."  (R. at 51.)  She spent most of her days watching television and only left the house every other day.  (R. at 55.)  If she had to go to out, she would shower and dress, otherwise she stayed in sweats.  (R. at 55–56.)  She got fatigued easily.  (R. at 57.)

Plaintiff's medication helped with her depression, anxiety, and bipolar issues, but did not make her feel like she was living a normal balanced life.  (R. at 53.)  Her medication helped her stay where she was at today.  (R. at 54.)  Plaintiff described her current condition as "kind of flat line," neutral, and depressed, and that she lacked energy or motivation to do anything.  (R. at 54.)

She explained that although her condition was stable, it was below average.  (R. at 57.)  She attended 45-minutes to hour-long therapy sessions every three weeks.  (R. at 55.)

**B.     Medical Records**

      **1.     Dr. Hirsh**

            **a.     Dr. Hirsh's Examination Findings**

In 2017, all of Dr. Hirsh's examinations found that Plaintiff's mood was depressed, anxious, and irritable (R. at 300); anxious and irritable (R. at 305); flat and unfeeling (R. at 310); euthymic and depressed (R. at 315); or depressed (R. at 319).  In addition, in 2017, Dr. Hirsh's examinations found that Plaintiff's affect was constricted, sad, and tearful (R. at 300); tense (R. at 305); tearful (R. at 311); labile and tearful (R. at 315); or constricted (R. at 319). Examinations in 2017 also generally found that Plaintiff had decreased concentration (R. at 300, 305, 311) and occasionally had attention abnormalities (R. at 300, 311).

In 2018, one of Dr. Hirsh's mental status examinations found that Plaintiff's mood was euthymic (R. at 410).  Otherwise, all of Dr. Hirsh's 2018 examinations found that Plaintiff's mood was depressed (R. at 415, 420, 425); dysthymic and mildly anxious (R. at 431); dysthymic and anxious (R. at 436, 451); dysthymic, depressed, and anxious (R. at 441, 467); or dysthymic and depressed (R. at 446, 456, 462, 472, 477.)  Similarly, one 2018 examination found that Plaintiff's affect was not constricted. (R. at 410.)  But all of Dr. Hirsh's other 2018 examinations found that Plaintiff's affect was constricted and flat (R. at 415, 425); constricted and flat/blunted (R. at 420); constricted (R. at 431, 436, 441, 446, 451, 462, 467, 472, 477); or constricted and tearful (R. at 456).  Dr. Hirsh's examinations in 2018 also regularly found that Plaintiff had decreased concentration (R. at 415, 420, 425, 431, 436, 441, 446, 451, 467, 472, 477), and that

she often had attention abnormalities (R. at 300, 311) or decreased attention (R. at 420, 425, 431, 436, 446).

During one examination in 2019, Dr. Hirsh found that Plaintiff's mood was euthymic, and that her affect was congruent with her mood. (R. at 872.) At all other appointments in 2019 and 2020, however, Dr. Hirsh's examinations found that Plaintiff's mood was depressed but not dysthymic (R. at 799–800, 909); depressed (R. at 904–05, 901, 891); depressed and anxious (R. at 896); depressed and dysthymic (R. at 886, 876, 867, 862, 858–59); or dysthymic, depressed, and anxious (R. at 881, 854, 872, 1015–16, 1012, 1007, 1003–04, 998, 993). In addition, all of Dr. Hirsh's other 2019 and 2020 examinations found that Plaintiff's affect was constricted and flat (R. at 799–800, 896, 1003–04) or constricted (R. at 901, 891, 886, 881, 876, 867, 862–63, 858–59, 853–54, 872, 1015–16, 1012, 1007, 998, 993). Roughly half of Dr. Hirsh's examinations in 2019 and 2020 found that Plaintiff had decreased concentration (R. at 896, 891, 886, 858–59, 872, 1016, 1012, 1007, 998.) All of Dr. Hirsh's 2019 and 2020 examinations found that Plaintiff's attention was normal. (R. at 872, 904–05, 799–800, 896, 1003–04, 901, 891, 886, 881, 876, 867, 862–63, 858–59, 853–54, 1015–16, 1012, 1007, 998, 993.)

All of Dr. Hirsh's other examination at all times were benign. All of Dr. Hirsh's mental status examinations found that Plaintiff had normal appearance, movement, and speech. (R. at 300, 305, 311, 315, 319, 410, 415, 420–21, 425–26, 431, 436, 441, 446, 451–52, 456, 462–63, 467, 472, 477–78, 799–800, 909, 904–05, 901, 891, 886, 881, 876, 872, 867, 862–63, 858–59, 853–54, 872, 1015–16, 1012, 1007, 1003–04, 998, 993.) All of Dr. Hirsh's mental status examinations from 2017 through 2020 found that Plaintiff's thought processes, insight, and judgement were not impaired, and that she never had delusions, illusions, hallucinations, obsessions, phobias, or suicidal or homicidal ideations. (*Id*.) Dr. Hirsh's examinations also

found that Plaintiff never had any memory loss. (*Id.*) Moreover, PHQ-9 depression screens were administered to Plaintiff at many appointments with Dr. Hirsh. Although Plaintiff's scores on those screens indicated that she was moderately severely depressed on one occasion (R. at 432), her scores otherwise indicated that she was only moderately depressed (R. at 416, 426, 436, 463, 468, 473, 896, 892, 867, 863, 859, 854, 1008, 998, 993) or mildly depressed (R. at 478, 800, 909, 905, 901, 886, 876, 872, 1016, 1004).

### b. Dr. Hirsh's Statements About Plaintiff's Ability to Work

On January 30, 2018, Dr. Hirsh completed a form seeking information to substantiate Plaintiff's short-term disability claim. (R. at 338–41.) Dr. Hirsh wrote that December 15, 2018, was a tentative return date. (*Id.*) Dr. Hirsh indicated that although there had been improvements, Plaintiff was still depressed and had trouble maintaining concentration. (*Id.*) Dr. Hirsh also wrote that she had observed that Plaintiff's affect was moderately depressed and constricted throughout entire sessions, Plaintiff's PHQ9 score demonstrated moderate depression, and that Plaintiff's concentration was impaired. (*Id.*) Plaintiff also did not appear labile as long as she was not stressed. (*Id.*) Dr. Hirsh wrote that Plaintiff had recently increased her Prozac and she had started to show some improvement and that this made her hopeful that Plaintiff could return to work in February or even earlier if Plaintiff could be allowed to return gradually. (*Id.*)

On March 13, 2018, Dr. Hirsh completed another form that sought information to substantiate Plaintiff's short-term disability claim. (R. at 340–41.) Dr. Hirsh wrote that she was not seeing much spontaneity and that Plaintiff's affect remained constricted and blunted although she was able to focus for short periods. (*Id.*) Dr. Hirsh indicated that Plaintiff had not checked her mail since February 2, 2018, and that she had limited motivation and was not persisting at tasks. (*Id.*) Although Dr. Hirsh wrote that Plaintiff had no mania, there had been no change in

her depression, and Plaintiff was still not showering daily, checking her mail, or eating healthy, and she was letting recycling pile up and just lied around at home watching television and playing solitaire. (*Id.*)

On April 26, 2018, Dr. Hirsh also wrote a letter explaining that because Plaintiff remained unable to work, she was extending Plaintiff's time off with a tentative return to work date of June 1, 2018. (R. at 336–37.) Dr. Hirsh wrote that Plaintiff completed an IOP with little perceived benefits. (*Id.*) Dr. Hirsh noted that participation in the IOP forced Plaintiff to get dressed and showered given that she tended not to do so and that she had agreed to go back to volunteering three-to-four days a week so that she would shower, dress, and brush her teeth on those days. (*Id.*) She also wrote that Plaintiff could concentrate for short periods during sessions, but that instructions often had to be repeated. (*Id.*) Plaintiff could do some tasks but not regularly and thus loaded the dishwasher only when the sink was full, took out trash when it was overflowing, and waited weeks to bring in recycling. (*Id.*) Plaintiff only brushed her teeth on mornings when she left the house but brushed them at night when she put in a dental appliance. (*Id.*) Dr. Hirsh wrote that Plaintiff's "biggest barrier to returning to work was her lack of ability to persist at any tasks, her easily being frustrated." (*Id.*)

On July 18, 2018, Dr. Hirsh completed a form seeking to confirm that Plaintiff's return to work date had been extended to September 15, 2018. (R. at 394–95.) Dr. Hirsh wrote that Plaintiff's bangs were in her eyes because she was neglecting to get usual haircuts. (*Id.*) Plaintiff appeared tired, her affect was constricted, her concentration was impaired, she appeared depressed, and barely moved when talking. (*Id.*) Dr. Hirsh noted that Plaintiff worsened when she was taken of Wellbutrin but that she was now getting out of bed since she started taking again and had finally volunteered at food pantry. (*Id.*) Plaintiff neglected to go through her mail

for three-to-four weeks but went to buy food when she ran out at home and had started walking on a treadmill for 10-to-20 minutes a day.  (*Id.*)

Dr. Hirsh's records also contain statements indicating that Plaintiff was "incapable of substantial gainful activity and employment."  (*See e.g.*, R. at 306, 311, 316, 416, 421, 426, 427, 433, 437, 442, 452, 453, 457, 463, 468, 472, 800, 965, 970, 976, 980, 984, 988, 993, 998, 1004, 1008, 1012, 1016.)

### 2.    Plaintiff's Hospitalization and Intensive Outpatient Programs ("PHP/IOP")

On December 1, 2016— prior to Plaintiff's alleged October 16, 2017, date of onset—it was recommended that Plaintiff participate in a PHP/IOP.  (R. at 262–63.)

In March 2018, Dr. Hirsh referred Plaintiff to an IOP.  (R. at 676.)  The records indicate that Plaintiff was referred to the IOP for "help reestablishing structure and routine prior to returning to work."  (R. at 751.)  A mental status examination performed by a LISW-S at program intake found that Plaintiff was oriented to person, place, and time; she was cooperative; her recent and remote memory were within defined limits; her language and speech content were appropriate; and she had fair judgment.  (R. at 677.)  But Plaintiff's mood and affect was depressed; her impulse control was overly controlled and restrained; her insight reflected partial awareness; and she had fair judgment.  (*Id.*)

Plaintiff was discharged from the IOP on April 3, 2018.  (R. at 751.)  The records indicate that she attended 11 IOP sessions before her discharge was mutually initiated and that she was "being discharged from IOP due to reaching maximum benefit and return to fulltime work.  (*Id.*)  Plaintiff's discharge condition indicated "moderate improvement."  (*Id.*)  The records state that Plaintiff expressed uneasiness about returning to work but that she felt better equipped to do so than she had prior to her IOP participation.  (R. at 751–52.)

3.      **SW Rental**

In a November 27, 2017 counseling note, SW Rental wrote that she observed that Plaintiff looked well groomed, pleasant, and calmer.  (R. at 361.)  Plaintiff reported that she was still not "up to par" and had passed on a chance to go to lunch with her sister and her niece and now regretted it.  (*Id*.)

In a December 4, 2017 counseling note, SW Rental wrote that she observed that Plaintiff was pleasant, cooperative, had moderate anxiety, and that her speech was clear, organized, and fluent.  (R. at 360.)  Plaintiff reported that her week's activities included volunteer work, shopping with her mother, and eating healthier but that she lacked exercise.  (*Id*.)  In a December 8, 2017 counseling note, SW Rental wrote that Plaintiff emailed to say that although her anxiety was down with Prozac, she was not doing much and that she was content to sit still and do nothing.  (R. at 358.)  In a December 20, 2017 counseling note, SW Rental assessed that Plaintiff was still clinically depressed and that if she did not improve in a week, they would note that Prozac had resulted in some improvement but not enough to return to work.  (R. at 359.)

In a counseling session note dated January 2, 2018, SW rental wrote that Plaintiff reported doing some mall walking for exercise and that she saw family over the holidays but still lacked motivation to do things at home.  (R. at 357.)  Plaintiff also reported that she was "not depressed in particular" but she was "not doing much."  (*Id*.)

In a January 15, 2018 counseling note, SW Rental wrote that she observed that Plaintiff was feeling better.  (R. at 356.)  Plaintiff was no longer content to just sit, she was becoming more animated, her sleep was good, and her concentration was getting better.  (*Id*.)  In a counseling note dated January 22, 2018, SW Rental wrote that she observed that Plaintiff was not particularly talkative and seemed unsure of herself and perhaps discouraged.  (R. at 354.)

12

On January 29, 2018, SW Rental wrote that she observed that Plaintiff looked much the same. (R. at 353.) Plaintiff reported that she was back to doing little at home, was content to just sit and stare, and that she did not do volunteer work that week. (*Id*.) SW Rental assessed that Plaintiff had "a bit of a setback" but hoped that increases in her antidepressant medications would help. (*Id*.)

In a counseling session note dated February 5, 2018, SW Rental wrote that she observed that Plaintiff had decreased energy, motivation, and increased stress. (R. at 352.) The following day, SW Rental completed a form seeking information to substantiate Plaintiff's short-term disability claim. (R. at 350–51.) SW rental wrote that she had observed that Plaintiff had a blunted affect, and limited energy, motivation, and the ability to make decisions, and that she had difficulty motivating herself to do more than what was necessary. (*Id*.) Plaintiff could read a short article or story or follow a television program for half an hour but could not read books. (*Id*.) SW Rental wrote that Plaintiff's episode of depression was more intractable than what she had experienced before. (*Id*.)

On February 12, 2018, SW Rental wrote that Plaintiff reported that she spent time with her parents and went out with her sister and brother-in-law. (R. at 349.) SW Rental assessed that Plaintiff was less depressed but blunted and that her motivation and energy levels kept her static. (*Id*.) On February 19, 2018, SW Rental wrote that she observed that Plaintiff had a blunted affect and was anxious although she did not show it outwardly. (R. at 348.) Plaintiff reported that she was content to do nothing which was uncharacteristic of her, but she watched the news and visited relatives. (*Id*.) On March 4, 2018, SW Rental wrote that she observed that Plaintiff was very much the same— she had no initiative and was content to be vegetative except

for caring for her dog. (R. at 347.) Plaintiff's speech was clear and relevant "but tension show[ed]." (*Id*.)

On April 3, 2018, the day that Plaintiff was discharged from participating in a second IOP, SW Rental observed that Plaintiff was "vegetative/depressed" and wrote that she had just finished participating in an IOP with "no significant improvement." (R. at 345.) SW Rental wrote that Plaintiff was stable but remained depressed, unable to motivate herself beyond what was minimally needed to survive, and that she had few outside interests beyond her pet and her family. (*Id*.) SW Rental indicated that this would be her last appointment with Plaintiff and that Plaintiff would be transferred to Irmina Light. (*Id*.)[4]

On April 3, 2018, SW Rental also completed a form seeking information to substantiate Plaintiff's short-term disability claim. (R. at 334–35.) SW Rental wrote that Plaintiff had a blunted affect, difficulty concentrating, could not motivate herself to do more than care for her necessities, and experienced anhedonia and feelings of worthlessness. (*Id*.) She also wrote that Plaintiff had blunted affect, little spontaneity in her speech, was anxious about the future and not being able to motivate herself. (*Id*.) SW Rental further wrote that Plaintiff paid the few bills she had on-line, showered once or twice a month, and mostly just sat. (*Id*.) SW Rental identified Plaintiff's concentration, motivation, and being overly reactive to small issues as clinical findings that represented barriers that precluded a return to work. (*Id*.) SW Rental wrote that Plaintiff had shown "no improvement so far" to recent medication changes and noted that Plaintiff had just completed IOP on March 30, 2018. (*Id*.)

---

[4] Other records indicate that Irmina Light is a LISW-S. (*See e.g.*, R. at 344.)

C.     **State Agency Reviewers**

State agency reviewing psychologist, Cynthia Waggoner, Psy.D. reviewed Plaintiff's file at the initial level on October 2018.  (R. at 70–74.)  Dr. Waggoner found that Plaintiff was limited to tasks where she is able to work at an average pace which does not require reaching production quotas and where she could relate to supervisors and coworkers on a superficial basis with minimal interaction with the general public.  (R. at 73–74.)  State agency reviewing psychologist, Bonnie Katz, Ph.D. reviewed Plaintiff's file upon reconsideration in January 2019 and made the same findings.  (R. at 86–88.)

## V.     ANALYSIS

As previously explained, Plaintiff alleges that the ALJ erred when performing a Listing analysis at step three.  (ECFNo.15, at PageID # 1086-88.)  Plaintiff also alleges that the ALJ erred in weighing the "opinions" from Dr. Hirsh, and SW Rental.  (*Id*., at PageID # 1082-86.)  The Court finds that none of these allegations of error have merit.

A.     **The ALJ's Did Not Commit Reversible Error at Step Three**

Plaintiff asserts that the ALJ committed reversible error when determining that her mental impairments did not meet or equal Listings 12.04 and 12.06 at step three.  At step three, Plaintiff carries the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, App. 1.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant meets all of the criteria of a listed impairment, he is automatically determined disabled; otherwise, the evaluation proceeds to step four.  20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers*, 582 F.3d at 653 ("A claimant must satisfy all of the criteria to meet the listing.").

When evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). Otherwise, "it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Id.* (citations omitted). On the other hand, an ALJ's explanation of her step-three determination need not be elaborate. The Sixth Circuit Court of Appeals has consistently rejected a heightened articulation standard, noting in *Bledsoe v. Barnhart* that the ALJ is under no obligation to spell out "every consideration that went into the step three determination" or "the weight [she] gave each factor in [her] step three analysis," or to discuss every single impairment. 165 F. App'x 408, 411 (6th Cir. 2006). Nor is the procedure so legalistic that the requisite explanation and support must be located entirely within the section of the ALJ's decision devoted specifically to step three; the court in *Bledsoe* implicitly endorsed the practice of searching the ALJ's entire decision for statements supporting his step three analysis. *See id*.

Listing § 12.04 establishes the criteria for depressive, bipolar, and related disorders; and Listing § 12.06 establishes the criteria for anxiety and obsessive-compulsive disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(A), 12.04, 12.06. To meet the Listings' severity level for these categories of disorders, a claimant must show that he meets: (1) the impairment-specific medical criteria in paragraph A; and (2) the functional limitations criteria in paragraph B or paragraph C. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). Stated differently, a claimant must demonstrate that she meets the requirement of Paragraphs A and B, or Paragraphs A and C, of Listing 12.04 and 12.06 to show that her impairments meet their Listing criteria.

Here, the ALJ did not explicitly determine if Plaintiff met the requirements of Paragraph A for Listing 12.04[5] or 12.06.  Instead, the ALJ determined that Plaintiff did not meet the Paragraph B or C criteria for either Listing.

### 1.    Paragraph B of Listings 12.04 and 12.06

As noted, a claimant can show that she meets Listings 12.04 and 12.06 by showing that she satisfies their Paragraphs A and Paragraph B requirements.  Paragraph B is the same for both Listings.  When considering the Paragraph B requirements, an ALJ uses a five-point scale (none, mild, moderate, marked, and extreme) to rate a claimant's degree of limitation in the four following areas of mental functioning:

(1) understand, remember or apply information;

(2) interact with others;

(3) concentrate, persist or maintain pace;

(4) adapt or manage oneself.

20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.06(B).  To satisfy that Paragraph B criteria, and ALJ must rate a claimant as having extreme limitations in one of these four areas or marked limitations in two of them.  *Id.* at §§ 12.04(B), 12.06(B).

---

[5] Paragraph A of Listing 12.04 provides that a claimant must show medical documentation of: (1) Depressive disorder, characterized by five or more of the following: (a) depressed mood; (b) diminished interest in almost all activities; (c) appetite disturbance with change in weight; (d) sleep disturbance; (e) observable psychomotor agitation or retardation; (f) decreased energy; (g) feelings of guilt or worthlessness; (h) difficulty concentrating or thinking; or (i) thoughts of death or suicide; or (2) Bipolar disorder, characterized by three or more of the following: (a) pressured speech; (b) flight of ideas; (c) inflated self-esteem; (d) decreased need for sleep; (e) distractibility; (f) involvement in activities that have a high probability of painful consequences that are not recognized; (g) or increase in goal-directed activity or psychomotor agitation.  20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.04(A).

In this case, the ALJ found that Plaintiff did not meet the Paragraph B criteria for Listings 12.04 and 12.06 because Plaintiff did not have an extreme limitation in any of the four functional area or marked limitations in two of them. Instead, the ALJ found that Plaintiff had only moderate limitations in three areas— understanding, remembering, or applying information; interacting with others; and concentration, persistence or maintaining pace— and had only mild limitation in the fourth one— adapting or managing oneself. (R. at 23.) The ALJ also explained her Paragraph B analysis. She wrote as follows:

> The claimant reported that, on a daily basis, she manages a personal care, takes medications, cares for her pets, takes her pets for a walk, prepares meals, watches television/movies, take short walks, reads, talks with others on the telephone, uses computer, and isolates herself from others (4E/1). Additionally, she reported that she straightens up around the house and washes dishes one to two times per week, and that she does laundry and takes out the trash on a monthly basis (Id. at 3). Further, she reported that she drives, shops at stores multiple times a week, is capable of paying bills and managing her finances, and that she socializes with others a couple times a month (Id. at 5). In addition, she reported that she has difficulty multitasking, is easily distracted, needs spoken instructions to be repeated, can maintain attention for 11 to 15 minutes, is easily annoyed by other people, resulting in isolating herself from others, and that she feels anxious around people that she does not know and crowds (Id. at 7). Also, she reported that stress negatively affects her concentration, causing her to become anxious and overwhelmed; however, she reported that she does not have difficulty with handling changes in routine (Id. at 8). During the hearing, she testified that she lives independently, watches television, drives three times per week, including picking up her mother once per week, visits her sister in Dayton, Ohioonce a month, shops for groceries weekly, and occasionally uses a computer (Hearing Testimony). Moreover, the record fails to document recurring emergency care or inpatient hospitalizations for mental impairments.

(*Id.*)

Plaintiff contends that the ALJ erred when finding that ALJ did not have an extreme and/or marked limitation in concentration, persistence and maintaining pace and in managing oneself. (ECF No. 15, at PageID # 1086.) Plaintiff appears to contend that Plaintiff's activities of daily living were not as robust as the ALJ described.

The Court agrees that the ALJ perhaps painted an overly rosy picture of Plaintiff's daily activities. When explaining her Paragraph B analysis, the ALJ noted, for instance, that Plaintiff managed personal care, prepared meals, straightened up around the house, washed dishes, and did laundry and trash removal on a monthly basis. (R. at 23.) In support, the ALJ cited an intake document that Plaintiff completed in 2017 indicating that her daily activities included such undertakings. (*Id*. citing R. at 208.) The record, however, contains subsequent documentation indicating that Plaintiff reported that she neglected showering or bathing (R. at 318, 419, 424, 476, 900, 334–35), brushing her teeth (R. at 318, 419, 424), changing clothes (R. at 414, 435), and that she struggled to regularly clean her house and kitchen (R. at 424, 430, 798, 866, 853, 1011, 1007, 1003 ), wash dishes (R. at 435, 890), or do laundry (R. at 414, 435, 890, 880, 853, 1007), and that she often waited for significant periods of time to take out trash or recycling (R. at 414, 419, 424, 430, 904). In addition, the ALJ noted in her step three analysis that Plaintiff "socialized with others a couple times a month" when the record perhaps more accurately reflects that Plaintiff's social contact was limited to family members. (R. at 908, 890, 849, 471.)

Nevertheless, Defendant asserts, and the Court agrees, that when reviewing the ALJ's step-three determination, the ALJ's decision must be read as a whole and that the ALJ's consideration of other evidence, including the results of Plaintiff's mental status examinations supports her Paragraph B analysis. The ALJ discussed those mental status examinations and noted that although they reflected "depressed mood, a constricted, flat/blunted affect, and decrease in concentrating ability," they also generally resulted in otherwise normal findings. (R. at 25.) That is an accurate description of the examination results, which found that notwithstanding Plaintiff's mood, affect, and concentration issues, she displayed normal

19

appearance, movement, and speech; Plaintiff's thought processes, insight, and judgment were not impaired; and Plaintiff had no delusions, hallucinations, obsessions, phobias, suicidal homicidal ideations, or memory loss. (*See* R. at 300, 305, 311, 315, 319, 410, 415, 420–21, 425–26, 431, 436, 441, 446, 451–52, 456, 462–63, 467, 472, 477–78, 799–800, 909, 904–05, 901, 891, 886, 881, 876, 872, 867, 862–63, 858–59, 853–54, 872, 1015–16, 1012, 1007, 1003–04, 998, 993.)

Other record evidence also supports the ALJ's determination that Plaintiff did not meet the Paragraph B criteria. Specifically, both state agency reviewing psychologists found that Plaintiff had moderate limitations in understanding, remembering, or applying information; interacting with others; and concentration, persistence or maintaining pace; and that Plaintiff had only mild limitation in adapting or managing oneself. (R. at 71, 85.); *See also Jones v. Comm'r of Soc. Sec.*, No. 5:10-cv-2621, 2012 WL 946997, at *8 (N.D. Ohio Mar. 20, 2012) ("[A]n ALJ is permitted, even encouraged, to rely on a medical expert for a professional medical analysis of whether, on a complicated record, a claimant meets or equals a listing."). For all these reasons the Court does not find that the ALJ erred when determining that Plaintiff did not meet the Paragraph B requirements for Listings 12.04 and 12.06.

### 2. Paragraph C of Listings 12.04 and 12.06

A claimant can alternatively show that she meets Listings 12.04 and 12.06 by showing that she satisfies their Paragraphs A and C requirements. Paragraph C is the same for both Listings. To meet Paragraph C of both Listings, a claimant must be able to demonstrate a:

> medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

> (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the] mental disorder; and

(2) marginal adjustment, that is, [the claimant has] minimal capacity to adapt to changes
in [his] environment or to demands that are not already part of [his] daily life.

20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04(C), 12.06(C).

In this case, the ALJ found that Plaintiff did not meet the Paragraph C criteria for Listings

12.04 and 12.06.  The ALJ wrote:

> The undersigned has also considered whether the "paragraph C" criteria are
> satisfied. In this case, the evidence fails to establish the presence of the "paragraph
> C" criteria. The record does not establish that the claimant has only marginal
> adjustment, that is, a minimal capacity to adapt to changes in his/her environment
> or to demands that are not already part of her daily life. Rather, the evidence
> summarized throughout this decision documents that she has attended numerous
> medical appointments, generally interacts well with medical providers, engages in
> many activities independently, and has adapted to modest changes including
> volunteer workattempts.

(R at 23.)

Plaintiff contends that the ALJ erred when determining that Plaintiff's adjustment was

not marginal because Plaintiff showed little to no improvement after years of therapy and that

Plaintiff's activities, such as volunteering and going to the gym, were limited.  (ECF No. 15, at

PageID # 1088.)  The Court again agrees that Plaintiff's daily activities were not as vigorous and

the ALJ possibly suggested.  For instance, the ALJ wrote that Plaintiff "engages in many

activities independently" when the record reflects that Plaintiff's independent activities were

generally limited to grocery shopping (R. at 309, 471, 476) occasionally taking her dog to the

park (R. at 1007), and exercising (R. at 450, 455, 1003) and that Plaintiff had assistance from her

mother for tasks like going through mail and filling out Social Security forms (R. at 450, 461,

866, 862, 1007).  In addition, the ALJ noted that Plaintiff engaged in volunteer work attempts.

(R. at 23.)   That these constituted "attempts" is an accurate qualifier given that Plaintiff

appeared to sporadically volunteer for short periods of time (R. at 309, 409, 414, 430, 445, 904,

875, 871, 866, 853), Plaintiff had difficulty getting to volunteer work because of her sleep schedule (R. at 875 ), was late when volunteering at least twice (R. at 849), and was ultimately fired from a volunteer position (R. at 1015).

As discussed previously, however, the ALJ also considered Plaintiff's relatively normal examination results.  (R. at 25.)  In addition, the ALJ discussed that Plaintiff participated in an IOP in 2018 and was discharged after she received the maximum program benefits.  (R. at 25.) That accurately reflects Plaintiff's discharge summary from the IOP which further stated that Plaintiff had experienced "moderate improvement," which is more than negligible improvement. (R. at 751.)  The ALJ also discussed evidence in the record demonstrating that Plaintiff's bipolar mania was stable or improved even though she continued to experience bipolar depression.  (R. at 26, 341, 377.)

Other record evidence also supports the ALJ's determination that Plaintiff did not meet the Paragraph C requirements.  Specifically, both state agency reviewing psychologists found that the record "[e]vidence did not establish the presence of the 'C Criteria.'"  (R. at 71, 85.); *See also Jones*, 2012 WL 946997, at *8.  For all these reasons the Court does not find that the ALJ erred when determining that Plaintiff did not meet the Paragraph C requirements for Listings 12.04 and 12.06.

**B.      Purported Medical "Opinion" Evidence**

Plaintiff also contends that the ALJ erred when assessing "opinions" from Dr. Hirsh and SW Rental.  A claimant's RFC is an assessment of "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1) (2012).  A claimant's RFC assessment must be

based on all the relevant evidence in a his or her case file. *Id*. The governing regulations[7] describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. §§ 404.1513(a)(1)-(5); 416.913(a)(1)–(5). With regard to two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program s policies and evidentiary requirements." §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5). Although there are five factors, supportability and consistency are the most important, and the ALJ must explain how they were considered. §§ 404.1520c(b)(2); 416.920c(b)(2). And although an ALJ may discuss how he or she evaluated the other factors, he or she is not generally required to do so. *Id*. If, however, an ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well-supported . . . and consistent with the record . . . but are not

---

[7] Plaintiff's application was filed after March 27, 2017. Therefore, it is governed by revised regulations redefining how evidence is categorized and evaluated when an RFC is assessed. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a), 416.920c (2017).

exactly the same, [the ALJ must] articulate how [he or she] considered the other most persuasive factors . . . . . " §§ 404.1520c(b)(3); 416.920c(b)(3).

In addition, when a medical source provides multiple opinions, the ALJ need not articulate how he or she evaluated each medical opinion individually. §§ 404.1520c(b)(1); 416.920c(b)(1). Instead, the ALJ must "articulate how [he or she] considered the medical opinions . . . from that medical source together in a single analysis using the factors listed [above], as appropriate." *Id.*

### 1.    Dr. Hirsh's Statements About Plaintiff's Inability to Persist at Any Task

Plaintiff contends that the ALJ erred by failing to find persuasive Dr. Hirsh's statements that Plaintiff's biggest barrier to returning to work was her inability to persist at any task. (ECF No. 15, at PageID # 1083.) The Court does not find that the ALJ committed reversible error.

As previously explained, an ALJ is not required to give opinions from medical sources any special deference. Instead, an ALJ is required to use five factors when considering medical source opinions and explain how the supportability and consistency factors were considered. The governing regulations provide that "acceptable medical sources" ("AMSs") are limited to physicians and psychologists, and (when acting within their areas of specialization) optometrists, podiatrists, audiologists, advanced practice registered nurses, physician assistants, and speech pathologists. 20 C.F.R. § 404.1520(a). Dr. Hirsh, a licensed psychiatrist, qualifies as an AMS because she is a physician.

The Court notes, however, that Dr. Hirsh's statement that Plaintiff's biggest barrier to returning to work was her inability to persist at any task was taken from a letter written by Dr. Hirsh explaining that she was extending Plaintiff's return to work date to June 1, 2018, because "Plaintiff would not be able to function at her job," which required multi-tasking. (R. at 336–37.) Defendant correctly contends that such statements about whether a claimant is able to work

constitutes "statements on issues reserved to the Commissioner" and that as such, it is not considered valuable or persuasive." 20 C.F.R. § 404.1520b(c)). For that reason, the Court is not convinced that the statement constitutes a medical opinion even though it comes from an AMS, and therefore, the ALJ was not required to articulate how she considered the supportability and consistency factors when she assessed it. Instead, the ALJ was required to consider it along with all the other evidence in Plaintiff's file. In this case, it is clear that the ALJ considered Dr. Hirsh's medical records, which included the statement about Plaintiff's extended return to work date. That is all that the regulations require.

In any event, Defendant asserts, and the Court agrees, that Dr. Hirsh's statement is not stated in vocationally relevant terms (i.e., it does not explain what Plaintiff could still do despite her impairments). "An ALJ can appropriately reject limitations that are vague and not defined." *Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008). *See also Wajnryb v. Colvin*, No. 2:14-CV-0170, 2014 WL 5803010, at *9 (S.D. Ohio Nov. 7, 2014) (finding ALJ did not err when assigning some weight to opinion that plaintiff may be limited by her pain because opinion did not indicate origin of pain or opine how pain was limiting in vocationally relevant terms), *report and recommendation adopted*, No. 2:14-CV-170, 2015 WL 418020 (S.D. Ohio Jan. 30, 2015); *Coleman v. Comm'r of Soc. Sec.*, No. 20-11568, 2021 WL 2560242, at *14 (E.D. Mich. June 7, 2021), (ALJ did not err when discounting opinion that plaintiff avoid triggers to migraines because opinion was not stated in vocationally relevant terms), *report and recommendation adopted*, No. 20-CV-11568, 2021 WL 2550866 (E.D. Mich. June 22, 2021); *Young v. Saul*, No. 1:20-cv-00059, 2021 WL 4295152, at * 8 (W.D. Ky. Apr. 27, 2021) (ALJ did not err when discounting weight given to consultative examiner's opinions that plaintiff could probably understand and remember tasks with mild difficulty and that he was mildly limited or

moderately limited in other domains because opinions were not stated in vocationally relevant terms). Thus, even if the statements constituted opinions, it was not error for the ALJ to discount them. For these reasons, the Court finds that Plaintiff's allegation lacks merit.

### 2. SW Rental's Statements

Plaintiff also contends that the ALJ erred by failing to find persuasive opinions from SW Rental. (ECF No. 15, at PageID # 1082.) The Court does not find that the ALJ committed reversible error.

As explained above, an ALJ is required to use five factors when assessing opinions from AMAs and explain how the supportability and consistency factors were considered. AMSs do not include licensed social workers like SW Rental. *See* Revisions to the Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844–01, 2017 WL 168819, *5856–47.[8] Accordingly, the records and statements from SW Rental constitute evidence from a "nonmedical source." 20 C.F.R. §§ 404.1513(a)(4); 416.913(a)(4). Evidence from nonmedical sources include "any information or statement(s) from a nonmedical source (including [a claimant]) about any issue in

---

[8] "Comment: We received many other public comments on the criteria we should use to add AMSs and whether we should add other medical sources, such as licensed clinical social workers (LCSW), to the AMS list. Most of these commenters supported recognizing LCSWs as AMSs, and they suggested we also add a wide variety of other medical sources and nonmedical sources, including licensed marriage and family therapists (LMFT), registered nurses (RN), licensed professional counselors (LPC), physical therapists (PT), chiropractors, and even healthcare professionals without medical licensure.

Response: We value these comments, and we will continue to monitor licensure requirements for the medical sources the commenters suggested we add. At this time, however, we have decided to add only APRNs, audiologists, and PAs as AMSs. Upon investigation of licensing requirements for other medical sources, we did not find a similar level of consistency or rigor in terms of education, training, certification, and scope of practice."

[a claimant's] claim."  20 C.F.R. §§ 404.1513(a)(4); 416.913(a)(4).  Although an ALJ must consider all evidence in a claimant's file using the factor enumerated above, an ALJ is not required to articulate how evidence from a nonmedical source was considered.  20 C.F.R. § 404.1520(d).

In this case, the ALJ discussed SW Rental's records and statements.  The ALJ was not required to give them any special deference or explain how they were assessed.  The ALJ was only required to consider the five factors enumerated above when she considered them.  There is nothing in the ALJ's determination that suggests that she did not do so. For these reasons, the Court finds that Plaintiff's allegation lacks merit.

## VI.    CONCLUSION

Based on the foregoing, Court finds that Plaintiff's allegations of error lack merit. Accordingly, the Court **AFFIRMS** the Commissioner's non-disability determination.

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE